Affirmed and Opinion filed April 13, 2010.

 

In The

 

Fourteenth Court of
Appeals

___________________

 

NO. 14-09-00058-CR

___________________

 

Roger Larry McCluer, Appellant

 

V.

 

The State of Texas, Appellee



 



 

On
Appeal from the 66th District Court

Hill County, Texas



Trial Court Cause No. 34,787

 



 

 

OPINION

Appellant, Roger Larry McCluer,
appeals from his conviction for capital murder.  A jury convicted appellant,
and the trial court sentenced him to the statutorily mandated life in prison
without parole.  On appeal, appellant contends that (1) the evidence is legally
and factually insufficient to sustain the conviction; (2) the trial court erred
in its submission of the jury charge; and (3) the court erred by failing to
inform prospective jurors that the State was not seeking the death penalty as
required by statute.  We affirm.

I.  Background

In the late evening of October 6 or early morning of
October 7, 2006, appellant hit Ken Hilliard on the head with a crowbar and then
shot and killed him on Hilliard’s property.  Appellant then left with several
pieces of Hilliard’s personal property.  At trial, appellant confessed to these
acts but asserted that the assaultive conduct was justified in self-defense.  A
jury convicted appellant of capital murder, finding that he committed murder in
the course of committing robbery.

Appellant testified at trial in his own defense. 
According to appellant, he had known Hilliard since May 2004 and had worked for
Hilliard doing auto body repairs at Hilliard’s property.  In October 2005,
appellant bought a truck and gave the title to Hilliard with the understanding
that when appellant paid Hilliard an outstanding debt, Hilliard would return
the truck title.  Appellant said that he paid the debt but allowed Hilliard to
retain the title because appellant had been staying at Hilliard’s property
“more than usual.”  Although the testimony is not entirely clear, it appears
that at some point someone reported the truck as stolen, which caused appellant
to be arrested, and another man, David Vernon, to acquire the truck.[1]  Appellant says
that when he called Hilliard about the situation, Hilliard offered him a different
vehicle for use.  The van Hilliard provided, however, had significant
mechanical problems and could only be driven short distances before
overheating.

On October 6, appellant drove the van to Hilliard’s
property.  According to appellant, Hilliard met him at the door and shook a
pistol “in [his] face.”  Two other people were at the property at that time: 
Mike Watkins and someone known as “Butch.”  They talked for awhile inside
Hilliard’s house before going outside and heading to Hilliard’s barn. 
Appellant said that once in the barn, Hilliard accused him of stealing a roll
of aluminum, saying “If I find out you’re stealing from me, I’m going to shoot
you.”  Hilliard reportedly repeated several times that if he found out that
appellant was stealing from him, he would drive to where appellant lived and
shoot him, and if appellant did not “come clean,” he would shoot him.

After Hilliard settled down, and Watkins and Butch
left the property, appellant and Hilliard were in the garage discussing what
appellant was going to do for a vehicle.  At that point, appellant said that he
noticed a pistol stuck in the back of Hilliard’s pants.  Eventually, Hilliard
became angry, told appellant he was going to shoot him, and reached for the
gun.  Appellant then grabbed a crowbar and hit Hilliard on the back of the
head.  Hilliard collapsed to the floor but continued “going for the gun,” so
appellant hit him a second time with the crowbar.  According to appellant,
Hilliard was still moving, but appellant was able to get the gun away from
him.  Appellant then entered the house, he said, to call for help.  Once
inside, he set the gun down on a coffee table and began to look for the phone. 
Within a minute, Hilliard entered the house, retrieved some paper towels, and
held them to his head.  Hilliard then reached for the gun on the coffee table,
and appellant picked up a different pistol that he had seen on a desk. 
Hilliard swung his pistol toward appellant, and appellant, who had his back to
Hilliard, held the other pistol over his shoulder and pulled the trigger.  The
gun appellant held then “went off,” and Hilliard fell to the ground.

After establishing that Hilliard was not breathing,
appellant sat down in a chair.  Appellant then took $1,200 from the house,
which he claimed Hilliard owed him for past work, along with the title to one
of Hilliard’s pickup trucks.  Appellant said that there was additional money at
the house, but he only took the $1,200 and a lockbox in which to hold it.  He
then drove away in the truck with the money, the lockbox, the title, the
crowbar, and the weapon he used to shoot Hilliard.  He subsequently “threw . .
. away” the crowbar and the firearm.  After spending a couple of hours at his
apartment, appellant checked into a series of motels.  Five days later, he
turned himself in and was arrested.  Appellant asserted that he did not desire
to kill Hilliard but felt that he was forced into doing so by Hilliard’s
conduct.  

On cross-examination, appellant acknowledged that he
had two prior convictions for theft.  He admitted that on the night of the
killing, he was angry about having lost his truck.  He further acknowledged
that after shooting Hilliard, he discovered that the gun Hilliard had stuck in
the back of his pants was not loaded.  The prosecutor further elicited
testimony from appellant to the effect that Hilliard had given money to Vernon
during a period in which he had refused to give money to appellant to get him
out of jail.   The prosecutor additionally questioned appellant regarding certain
alleged inconsistencies between his trial testimony and previous written and
oral statements regarding the events surrounding Hilliard’s death.

Mike Watkins testified that he and a friend named
Butch were at Hilliard’s property on the evening of October 6, 2006.  Hilliard had
shot a gun in the air earlier in the evening as a prank to startle people.  When
appellant arrived, Watkins saw the headlights of appellant’s vehicle appear to turn
on while on the gravel road to Hilliard’s property, whereas typically a
vehicle’s headlights could be seen from a further distance.  Watkins said that
at one point during the evening, he overheard Hilliard and appellant arguing in
the barn over metal and heard Hilliard say he would kill someone if they “were
stealing” from him.  According to Watkins, Hilliard’s voice got pretty loud.  Also,
during the evening, Watkins noticed that appellant was acting strange and
jittery and that he “kept disappearing.”  By the time the two men came back
from the barn, Hilliard had returned to normal.  Butch then advised appellant
that he should tell Hilliard if he was stealing from him.  Watkins asked
Hilliard if he was going to be okay, and if it was alright for them to leave,
and then Butch and Watkins left the property, leaving appellant alone with
Hilliard.

William “Butch” Ross testified regarding a visit he
made to Hilliard’s property with Watkins, but he could not remember the date.  He
observed some tension after appellant arrived because Hilliard apparently felt
that appellant was stealing from him.  Ross said that the first time he had ever
heard Hilliard raise his voice was that night in talking to appellant.  According
to Ross, appellant was “stand-offish” and “nervous looking” that evening. 
After appellant and Hilliard argued in the barn, they came back to the house
and everything seemed normal.  Ross asked Hilliard if he wanted them to stay;
Hilliard replied that “it’s all over with, I said my piece and we’re done.” 
Ross and Watkins then left Hilliard and appellant.  Ross further verified that Hilliard
kept a gun “around his computer desk,” but always in the drawer, not in plain
sight.  Ross was surprised to hear Hilliard say that he would kill someone for
stealing and did not believe Hilliard was capable of actually doing so.

Lacey Field testified that she had previously dated
appellant, but by 2006, they were just friends.  She said that appellant came
to her apartment on October 7 of that year and appeared as though something was
bothering him.  Appellant left money in her apartment when he turned himself in
to police.  According to Field, appellant was a very “sweet” person and not
capable of murder.

Steve Jones testified that he had known appellant
since they were children, and appellant told him that he killed Hilliard in
self-defense.  Appellant also indicated to Jones his annoyance that Hilliard
had given a vehicle title to someone else; indeed, his reason for going to
Hilliard’s house on the day Hilliard died was to obtain a better vehicle from
Hilliard.  Appellant told Jones that Hilliard was reaching for a gun stuck in
the back of his pants when appellant hit him with the crowbar.  According to
Jones, appellant expressed remorse at having fled the scene and not gotten help
for Hilliard.

Tracy Dyer, a medical examiner for Dallas County,
testified that she performed an autopsy on Hilliard which revealed that (1) his
skull had been fractured by a blow to the head, (2) he had ingested
methamphetamine, and (3) the cause of death was a gunshot wound and “blunt
force head injuries.”  Vincent DiMaio, an expert forensic pathologist called to
testify by appellant, refuted Dyer’s assertion that the head injury contributed
to Hilliard’s death.  DiMaio further emphasized that Hilliard apparently had
relatively high levels of methamphetamine in his system and that people who are
“high” on methamphetamine can be dangerous to other people.

Other witnesses testified regarding the finding of
Hilliard’s body, the conditions of the house at that time, and how the
investigation came to focus on appellant.  A police officer opined that at the
time of his death, Hilliard had not been holding a pistol found near his body,
based on:  (1) the presence of blood on both of Hilliard’s hands and its
absence on the pistol, and (2) the position of the pistol in relation to
Hilliard’s body.  Other evidence and testimony supported at least portions of
appellant’s description of events:  blood was found in the garage; when he
turned himself in, appellant arrived in Hilliard’s pickup; there was recorded
video of someone fitting appellant’s general description driving Hilliard’s
truck to a car wash and there apparently throwing a crowbar into a dumpster.  Additionally,
there was testimony from several witnesses that there may have been another
larger safe missing from Hilliard’s property with a greater amount of money
missing as well.  Several witnesses also testified to Hilliard’s propensity for
“pranking” people at his property, particularly by firing a .22 pistol, often
loaded with blanks (although one witness stated that the night in question was
the first time he’d ever seen Hilliard shoot in such a manner).  Several people
also testified that Hilliard was a nice and nonviolent person.  Also admitted
were prior statements appellant had made regarding the night in question.

As stated, the jury convicted appellant of capital
murder.  The trial court then sentenced him to the statutorily mandated life in
prison without parole.

II.  Sufficiency of the Evidence

In his first three issues, appellant contends that
the evidence was legally and factually insufficient to support the jury’s verdict. 
Because appellant does not differentiate in his arguments between the differing
standards for legal and factual sufficiency analysis, we will address the
arguments altogether while keeping in mind the distinct standards of review.  Appellant
was convicted of capital murder for intentionally causing Hilliard’s death by
“striking him on the head with a metal object and/or shooting him with a deadly
weapon, to-wit: a firearm,” in the course of attempting to commit or committing
robbery of Hilliard.  See generally Tex. Penal Code § 19.03(a)(2).

A. Standards of Review

In a legal sufficiency review, we view all of the
evidence in the light most favorable to the verdict and determine whether a
trier of fact could have found each element of the offense beyond a reasonable
doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979); Young v. State,
14 S.W.3d 748, 753 (Tex. Crim. App. 2000).  The jury is the exclusive judge of
the credibility of witnesses and of the weight to be given to their testimony;
it is the exclusive province of the jury to reconcile conflicts in the
evidence.  Wesbrook v. State, 29 S.W.3d 103, 111 (Tex. Crim. App.
2000).  Thus, when performing a legal sufficiency review, we may not reevaluate
the weight and credibility of the evidence and substitute our judgment for that
of the fact-finder.  Dewberry v. State, 4 S.W.3d 735, 740 (Tex. Crim.
App. 1999).  We must resolve any inconsistencies in the testimony in favor of
the verdict.  Curry v. State, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

In a factual sufficiency review, we consider all of
the evidence in a neutral light, favoring neither party.  Watson v. State,
204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006); Drichas v. State, 175
S.W.3d 795, 799 (Tex. Crim. App. 2005).  We then ask whether (1) the evidence
supporting the conviction, although legally sufficient, is nevertheless so weak
that the jury’s verdict seems clearly wrong and manifestly unjust, or (2)
considering conflicting evidence, the jury’s verdict is against the great
weight and preponderance of the evidence.  Watson, 204 S.W.3d at 414-15,
417; Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). 
Additionally, we must give due deference to the jury’s determinations,
particularly those concerning the weight of the evidence and the credibility of
witnesses.  See Johnson, 23 S.W.3d at 8-9.

B.  Murder in Course of Robbery

In his first issue, appellant contends that the
evidence was insufficient to prove that he murdered Hilliard in the course of
committing or attempting to commit a robbery.  See Tex. Penal Code §
19.03(a)(2).  Although appellant acknowledges evidence that he shot and killed
Hilliard and then stole his property, appellant asserts that there was no
evidence that he committed the murder in order facilitate stealing Hilliard’s
property.  He points out that proof of theft committed as an afterthought and
unrelated to a murder will not elevate the offense to capital murder.  See
Herrin v. State, 125 S.W.3d 436, 441 (Tex. Crim. App. 2002).  According to
appellant, there was no evidence of an ongoing robbery or of an intent to steal
at the time he shot Hilliard; he decided to take the money, the vehicle, and
the other items only afterwards.  Appellant further suggests that given his beneficial
relationship with Hilliard, it would not be reasonable to think that he would
need to kill Hilliard to get something from him.

The Court of Criminal Appeals has held, “a theft
occurring immediately after an assault will support an inference that the
assault was intended to facilitate the theft.”  Cooper v. State, 67
S.W.3d 221, 224 (Tex. Crim. App. 2002) (relying on McGee v. State, 774
S.W.2d 229, 234 (Tex. Crim. App. 1989), which applied the same inference in a
capital murder case).[2] 
Therefore, the jury could have concluded that the fact appellant stole
Hilliard’s property after causing his death indicated that the murder occurred
in the course of committing a robbery.  Indeed, the jury could have determined
based on the facts of this case that appellant had formed the intent to steal
before he hit Hilliard with the crowbar.  After doing so, appellant entered the
house, shot Hilliard when he unexpectedly entered after appellant, and then left
with Hilliard’s property.

Appellant argues that the inference discussed in Cooper
does not apply in the present case because there is no evidence establishing
how much time elapsed between the shooting and the theft.  However, appellant’s
own testimony suggests that the time gap was a short one.  According to his
testimony, the only thing he did between the time he shot Hilliard and the time
he started taking Hilliard’s property was sit down in a chair.  While he does
not specify exactly how long he sat in the chair, the implication of his
testimony is that it was a short time.  Accordingly, we find that the jury could
have reasonably inferred from the proximity of the theft to the shooting that
appellant committed murder in the course of committing a robbery.  This
conclusion is further supported by, among other things, the evidence that
appellant was angry with Hilliard over the loss of his truck and that Hilliard
had accused appellant of stealing from him.  We overrule appellant’s first
issue.

C.  Intent to Kill

In his second issue, appellant asserts that the
evidence was insufficient to prove that he intentionally caused Hilliard’s
death.  Appellant admitted in his testimony, and acknowledges in his brief,
that he shot Hilliard, who died of the resulting wound.  Appellant argues,
however, that the evidence indicates his firing only one shot, not at close
range.  The jury could have reasonably concluded, however, that appellant’s firing
a single bullet at Hilliard within a house (by appellant’s own testimony, at
most one room apart) evidenced that appellant intended to kill Hilliard.  See
Ex parte Thompson, 179 S.W.3d 549, 556 n.18 (Tex. Crim. App. 2005) (“It is
both a common-sense inference and an appellate presumption that a person
intends the natural consequences of his acts, and that the act of pointing a
loaded gun at someone and shooting it toward that person at close range
demonstrates an intent to kill.”).

Appellant further bases his argument on evidence showing
that he did not own the weapon he used to kill Hilliard and that he did not
bring a weapon with him to Hilliard’s property.   However, he offers no record citation
in support of either of these assertions.  Furthermore, even if these assertions
were founded in the record, the evidence would not necessarily be rendered insufficient. 
The jury could have reasoned that appellant formed the intent to kill Hilliard
only after arriving at the property and used one of Hilliard’s weapons to do so
or that appellant came to the property knowing that he could use one of Hilliard’s
own weapons to kill him.

Lastly, appellant points out that he shot Hilliard only
when Hilliard followed him into the house from the garage.  However, he offers
no nexus between this apparent fact and negation of the intent element.  The
jury could have reasoned that appellant intended to kill Hilliard when he hit
Hilliard on the head twice with a crowbar and that such intent carried over
into the house, where appellant shot Hilliard.  Alternatively, the jury could
have concluded that appellant formed the intent to kill only when Hilliard
entered the house from the garage.  Either of these conclusions, each supported
by sufficient evidence, supports the jury’s ultimate conclusion that appellant
intentionally caused Hilliard’s death.  See Ex parte Thompson, 179
S.W.3d at 556 n.18 (holding that a person can be held to have intended the
natural consequences of his acts).  Finding no merit in appellant’s arguments,
we overrule his second issue.

D.  Robbery

In his third issue, appellant contends that there was
no evidence establishing a robbery, a required element for proving capital
murder.  As appellant points out, robbery in this context required proof of
assaultive conduct occurring in the course of a theft, citing Tex. Penal Code
§§ 29.01(1) and 29.02(a)(2).  Although appellant acknowledges evidence of
assaultive conduct and of theft, he asserts that there was no evidence of
assaultive conduct occurring during the course of the theft.  This argument is essentially
a rephrasing of the argument discussed above concerning whether there was
evidence to establish that an intent to steal existed at the time of the
murder; the conduct alleged to have resulted in murder being the same as the
allegedly assaultive conduct.  As we explained above, a jury may reasonably
infer that when a theft occurs immediately after an assault, the assault was intended
to facilitate the theft.  See Cooper, 67 S.W.3d at 224.  Because the
evidence in the present case indicates that appellant stole Hilliard’s property
shortly after hitting him with a crowbar and then shooting him, the jury could
have reasonably concluded that appellant committed the assaultive conduct in
order to steal the property.  Thus, the elements of robbery have been met.  We
overrule appellant’s third issue.

III.  Jury Charge Issues

In his fourth, fifth and sixth issues, appellant claims
error in the jury charge.  A claim of jury-charge error is governed by the
procedures set forth in Almanza v. State, 686 S.W.2d 157, 171 (Tex.
Crim. App. 1985).  We must first determine whether the trial court erred in its
submission of the charge.  Barrios v. State, No. PD-0891-08, 2009 WL
1175070, at *2 (Tex. Crim. App. 2009).  If error exists and appellant properly
objected at trial, reversal is required if “some harm” resulted, i.e.,
if the error was “calculated to injure the rights of the defendant.”  Id.
(quoting Almanza, 686 S.W.2d at 171).  If appellant failed to object,
error must be “fundamental” and reversal will result only if the error was so
egregious and created such harm that the defendant “has not had a fair and
impartial trial.”  Id. (quoting Almanza, 686 S.W.2d at 171).

A trial judge must submit to the jury “a written
charge distinctly setting forth the law applicable to the case; not expressing
any opinion as to the weight of the evidence, not summing up the testimony,
discussing the facts or using any argument . . . calculated to arouse the
sympathy or excite the passions of the jury.”  Walters v. State, 247
S.W.3d 204, 208 (Tex. Crim. App. 2007) (quoting Tex. Code Crim. Proc. art.
36.14).  The trial judge is required to instruct the jury on statutory
defenses, affirmative defenses, and justifications whenever they are raised by
the evidence.  Id. at 208-09.  A defendant is entitled to an instruction
on every defensive issue raised by the evidence, “whether that evidence is weak
or strong, unimpeached or uncontradicted, and regardless of what the trial
court may or may not think about the credibility of the defense.”  Allen v.
State, 253 S.W.3d 260, 267 (Tex. Crim. App. 2008) (quoting Hamel v.
State, 916 S.W.2d 491, 493 (Tex. Crim. App. 1996)).  A defendant is not
entitled, however, to an instruction on a defensive theory that is not
explicitly listed in the Penal Code, i.e., one that merely negates an
element of the offense rather than justifying or excusing the conduct.  Walters,
247 S.W.3d at 209.  Furthermore, a defendant is not entitled to an instruction on
a statutory defense if that instruction:  “(1) is not grounded in the Penal
Code, (2) is covered by the general charge to the jury, and (3) focuses the
jury’s attention on a specific type of evidence that may support an element of
an offense or a defense.”  Id. at 212.

A.  Verbal Provocation Language

In his fourth issue, appellant contends that the
trial court erred in including the following language in the instruction on self-defense:
 “the use of force against another is not justified in response to verbal
provocation alone.”  In support of his contention, appellant argues that when
there is evidence of the victim’s verbally threatening the defendant and the
defendant’s therefore acting in self-defense, a charge on self-defense should
not be restricted to only the acts of the victim but should also include verbal
threats, citing Ellis v. State, 811 S.W.2d 99, 101 (Tex. Crim. App.
1991).[3] 
According to appellant, the court’s charge “specifically restricted the
self-defense instruction [so as] not to include verbal threats.”  This is a
misreading of the challenged language.  The language in question expressly
advised the jury that the use of force is not justified when the sole
provocation is verbal.  It does not state or even suggest that the jury could
not consider verbal provocation in conjunction with provocative action. 
Furthermore, the language used by the court was taken nearly verbatim from, and
thus clearly authorized by, the Texas Penal Code.  See Tex. Penal Code §
9.31(b)(1) (“[t]he use of force against another is not justified . . . in
response to verbal provocation alone”).  Appellant’s argument is without merit. 
Accordingly, we overrule his fourth issue.

B.  Instruction on Aid After Self-Defense

In issue five, appellant assigns error to the trial
court’s refusal to instruct the jury that a person who lawfully uses force in
defending himself is subsequently under no obligation to come to the aid of his
attacker.  Appellant maintains that this issue was raised by the prosecutor’s
cross-examination inquiring as to whether appellant tried to call for help
after hitting Hilliard with the crowbar and shooting him.  The prosecutor’s
questions followed appellant’s testimony that after hitting Hilliard, he
entered the house intending to call for help and yet did not do so  There is no
indication in the record that appellant was prosecuted for any failure to
render aid.  Appellant was prosecuted for and convicted of murder in the course
of committing a robbery.  He raised the issue of self-defense as a
justification for the killing.  Appellant suggests in his brief that the
prosecutor’s questions could have “reasonably put the idea in the minds of the
jurors” that appellant was required to have rendered aid before he could be
exonerated for acting in self-defense.

As stated above, under Walters, a defendant is
not entitled to an instruction on a statutory defense if that instruction:  “(1)
is not grounded in the Penal Code, (2) is covered by the general charge to the
jury, and (3) focuses the jury’s attention on a specific type of evidence that
may support an element of an offense or a defense.”  247 S.W.3d at 212.  We apply
those criteria to the requested instruction.  First, although the issue of
self-defense is certainly grounded in the Penal Code, appellant cites to
nothing in the code, and we have discovered nothing, indicating that the
requested addition to the self-defense charge is grounded therein.  Second, the
charge as given sets forth the elements of self-defense so as to render the
requested instruction unnecessary.  The jury was instructed that if certain
elements were met, appellant should be deemed justified in his use of force; no
mention is made, nor need be made one way or the other, regarding rendering aid
after the use of force.  Third, the requested instruction could have unduly
focused the jury’s attention on appellant’s testimony that he entered the house
for the purpose of calling for help, testimony which supported the self-defense
theory.  Because the requested instruction did not meet any of the Walters
criteria, we find that the trial court did not err in refusing to include the
instruction in the charge.  We overrule appellant’s fifth issue.

C.  Instruction Related to Timing

            In
his sixth issue, appellant argues that the court erred in denying an
instruction informing the jury that “[i]n order for a murder to qualify as
capital murder, the killer’s intent to rob must be formed before or at the time
of the murder.”  We will again apply the Walters criteria.  To begin
with, appellant cites no support in the Penal Code for this instruction. 
Although the code certainly provides that one way a murder can be elevated to
capital murder is if the perpetrator committed the murder “in the course of”
committing a robbery, the code does not directly support the language appellant
requested.  See Tex. Penal Code § 19.03(a)(2).  Furthermore, the language
of the charge submitted specified that capital murder occurs when a person
commits murder “in the course of committing . . . robbery.”  The charge additionally
defined “[i]n the course of committing” as “conduct in an attempt to commit,
during the commission or in the immediate flight after the attempt or
commission of the offense.”  And it defined “robbery” as requiring either
intent or knowledge.  Thus, as submitted, the charge effectively limited jurors
to finding capital murder only if at the time of the murder or immediately
prior thereto, appellant intended to commit robbery.  Consequently, the import
of the requested instruction was already covered by the charge as submitted. 
Lastly, the additional language sought by appellant would have added undue emphasis
to appellant’s testimony suggesting that he committed theft or robbery only as
an afterthought.  In conclusion, appellant’s requested instruction did not pass
any of the Walters criteria.  The trial court did not err in refusing to
include the instruction in the charge.  We overrule appellant’s sixth issue.

IV.  Information on Punishment

In his seventh issue, appellant assigns as error the
trial court’s failure to inform prospective jurors that the state was not
seeking the death penalty and that a sentence of imprisonment for life would be
mandatory in the event of conviction, as required by section 12.31(b) of the
Texas Penal Code.  Tex. Penal Code § 12.31(b).  The statutory provision in
question is mandatory, and the record does not reflect that the trial court
informed prospective jurors as required.  In short, the trial court erred.

Based on the fact that the court failed to fulfill
the requirements of a mandatory statute, appellant contends that he is entitled
to a reversal regardless of whether he was harmed by the error, citing Sodipo
v. State, 815 S.W.2d 551 (Tex. Crim. App. 1990).  We are unpersuaded by Appellant’s
argument because Sodipo is not controlling law on this point.  See,
e.g., Dukes v. State, 239 S.W.3d 444, 447 (Tex. App.—Dallas 2007,
pet. ref’d) (recognizing Court of Criminal Appeals’ implicit overruling of Sodipo). 
Except for certain errors deemed “structural” under the United States
Constitution, no error, whether involving a mandatory requirement or otherwise,
is categorically immune from harm analysis.  Cain v. State, 947 S.W.2d
262, 264 (Tex. Crim. App. 1997); see also Ford v. State, 73 S.W.3d 923,
925 (Tex. Crim. App. 2002) (“Under our harmless error rule the violation of a
mandatory statute does not, by itself, call for the reversal of a
conviction.”).  Whenever nonstructural error is shown to be harmless, it cannot
be a ground for reversal.  Cain, 947 S.W.2d at 264.  Thus, we must
conduct a harm analysis on the trial court’s error.

Under Rule 44.2(b) of the Texas Rules of Appellate
Procedure, nonconstitutional error must be disregarded unless it affects the
defendant’s “substantial rights.”  Tex. R. App. P. 44.2(b).  Error in failing
to follow statutory dictates is nonconstitutional in scope.  Gray v.
State, 159
S.W.3d 95, 97-98 (Tex. Crim. App. 2005).  A substantial right is
affected when the error had a substantial and injurious effect or influence in
determining the jury’s verdict.  Haley v. State, 173 S.W.3d 510, 518
(Tex. Crim. App. 2005).  If the error had no effect or only a slight influence
on the verdict, it is considered harmless.  Johnson v. State, 967 S.W.2d
410, 417 (Tex. Crim. App. 1998).

The Court of Criminal Appeals has recognized that the
harm flowing from errors occurring in the context of jury formation can be
difficult to discern from an analysis focusing on the ultimate outcome of a trial. 
See Ford, 73 S.W.3d at 925-26.  Thus, in conducting a harm analysis of
jury-formation error, a court should consider what right is protected by the
statute.  Id. at 926.  As the Court of Criminal Appeals
stated in a substantially similar case:  “In this case, the right protected by § 12.31(b)
is the right to have the prospective jurors informed that the state is not
seeking the death penalty and that a sentence of life
imprisonment without parole is mandatory upon conviction of the capital
offense.”  Murphy v. State, No. PD-0798-08, 2009 WL 3368693, at *5 (Tex.
Crim. App. Oct. 21, 2009) (not designated for publication).  The court further
advised in Murphy that the substantial right at issue in matters
pertaining to voir dire is “the ability to empanel only those jurors who are
qualified to serve.”  Id.  The court then placed the burden of showing
harm on the appellant, stating:  “If an appellant does not present record
evidence that demonstrates that the trial court’s error deprived her of a jury
comprised of legally qualified jurors, she suffered no harm.”  Id.
(citing Gray v.
State, 233
S.W.3d 295, 301 (Tex. Crim. App. 2007)).

In Murphy, the court ultimately concluded that
the appellant failed to show deprivation of a jury comprised of legally qualified
jurors and affirmed her conviction on that basis.  Id. at *6.  Likewise,
here, appellant has made no such showing, and we discern no such deprivation of
rights from the face of the record.  Therefore, we conclude that although the
trial court erred when it failed to properly inform prospective jurors, nothing in the record indicates deprivation of appellant’s
substantial right to empanel only qualified jurors.  Accordingly, the error was
harmless.  We overrule appellant’s seventh issue.

Having disposed of all of appellant’s issues, we
affirm the trial court’s judgment.

                                                                                    

                                                                        /s/        Adele
Hedges

                                                                                    Chief
Justice

 

 

 

Panel consists of Chief
Justice Hedges and Justices Anderson and Christopher.

Do
Not Publish — Tex. R. App. P. 47.2(b).









[1] In his testimony at
trial, Vernon stated that he had originally sold the truck to appellant, but
appellant failed to pay Vernon for the truck.  Vernon then essentially
repossessed the truck from appellant.  According to Vernon, both men agreed
that Hilliard would keep the title during the period when appellant had
possession of the truck but had yet to pay for it.





[2] Appellant cites Ibanez
v. State, for the proposition that when the State alleges the same
assaultive conduct for both the murder and the robbery, it has to prove that
the murder was committed with the intent to obtain control of the victim’s
property.  749 S.W.2d 804, 807 (Tex. Crim. App. 1986).  As the facts and
resolution in McGee reflect, however, this statement in Ibanez
does not mean that the jury cannot infer such intent from the proximity of the
murder and the theft or robbery.  McGee, 774 S.W.2d at 231-34.





[3] As to the continuing
precedential value of Ellis, please see the Court of Criminal Appeals
analysis in Walters.  247 S.W.3d at 207-214.